Martin v. State 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-93-00625-CR







Robert Paul Martin, Appellant




v.




The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT


NO. 0934334, HONORABLE TOM BLACKWELL, JUDGE PRESIDING








 Appellant Robert Paul Martin was convicted of the strangulation murder of Lisa
Wagner. See Penal Code, 63d Leg., R.S., ch. 399, sec. 1, § 19.02, 1973 Tex. Gen. Laws 883,
913, amended by Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen.
Laws 1122, 1123 (Tex. Penal Code Ann. § 19.02, since amended). The jury assessed punishment
at eighty years' imprisonment and an $8,000 fine. Appellant raises three points of error relating
to the admission of evidence and ineffective assistance of counsel. We will affirm the conviction.



BACKGROUND


 On July 8, 1991, the partially nude body of Lisa Wagner was discovered in a
shallow creek in a rural area of Travis County. The medical examiner determined that Wagner
died around midnight on July 7 as a result of manual strangulation. The body had a circular
bruise on the buttocks. Fresh sperm was present in the vagina and rectum. At the crime scene,
police discovered three Diamond Shamrock gasoline coupon stamps downstream from the body. 
These stamps were determined to have been distributed from a gas station in Las Cruces, New
Mexico, sometime after July 1, 1991.

 Homicide detective Gary Cutler of the Travis County Sheriff's Department led the
murder investigation. The investigation centered around identifying an unknown man Wagner was
last seen dancing with at the New West nightclub in Austin on the night of her murder. Several
patrons described the unknown Caucasian man as between 6'3" and 6'5", approximately 200
pounds, with curly blond hair, wearing western clothes and a cowboy hat. During the course of
his investigation, Cutler focused on ten different suspects. Several of these suspects were shown
in photo lineups to the witnesses without success.

 After viewing a composite sketch printed in the newspaper, Eric Hale, himself a
previous suspect, reported to Cutler that the sketch resembled appellant. Hale recalled introducing
appellant to Wagner at New West in the fall of 1990. Hale also provided Cutler with photographs
of appellant. Cutler created a photo lineup using appellant's picture. Candace Smith Leonard and
James Mailloux, two of the nightclub patrons who had seen the unknown man dancing with
Wagner, positively identified appellant's photo.

 On the morning of September 20, 1991, Cutler and four other investigators went
to appellant's place of work to question him. When appellant arrived, Cutler requested that he
come with him to the sheriff's office to discuss an investigation; appellant agreed. Upon arrival
at the sheriff's office at 8:12 a.m., Cutler advised appellant of his Miranda rights, and appellant
signed a warning card indicating he understood those rights. Following a discussion about
appellant's background, Cutler, along with Texas Ranger Ron Stewart, explained that they were
investigating Wagner's murder. 

 During this interview, appellant admitted that he had been to New West eight to
ten times, knew Eric Hale, and had met and danced with Wagner at the club. Appellant also
indicated that he drove to Las Cruces, New Mexico on July 3, 1991, returning to Austin about
6:30 p.m. on July 7. He denied going to New West that night and denied any involvement in the
murder. Appellant was cooperative during the interview. In turn, the investigators cooperated
with appellant. Appellant smoked, drank coffee, and went to the restroom several times. At some
point during the interview, appellant asked to speak with his fiancée, Lucy West. The detectives
brought her to the sheriff's office where she and appellant spoke privately for about fifteen
minutes. After they finished their discussion, Cutler and Stewart rejoined the pair. West told the
officers that she thought appellant needed a lawyer. Appellant, however, said nothing and lit a
cigarette. The interview continued.

 Although Cutler learned at around 11:00 a.m. that appellant had been indicted by
the grand jury for Wagner's murder, he did not immediately tell appellant of the indictment. An
assistant district attorney arrived at the sheriff's office and helped Cutler draft forms for consent
to search appellant's vehicle and to obtain samples of appellant's body fluids. After reading the
consent forms, appellant signed the form for consent to search his vehicle at 11:24; he signed the
consent to search his person at 11:44. After appellant had signed these consent forms, Cutler
asked him if he wished to make a written statement. Appellant then requested an attorney. At
that point, Cutler informed appellant that he had been indicted for Wagner's murder and was
under arrest; the interview terminated.

 The search of appellant's truck revealed evidence linking him to the murder. There
was a July 7, 1991 gas station receipt from the same Las Cruces, New Mexico Diamond
Shamrock station that issued the stamps found downstream from Wagner's body at the crime
scene. There was a blanket with a pubic hair that was consistent with Wagner's hair. Police also
discovered a metal pipe with the same diameter as the circular bruise on Wagner's buttocks. The
body-fluid samples revealed that appellant was in the ten to thirteen percent of the white male
population that could have produced the semen found in Wagner's body.

 Appellant filed a pretrial motion to suppress this evidence on the ground that it was
the result of an unlawful search. He also challenged witness identifications on the ground that the
photo lineups were impermissibly suggestive. Following a hearing, the trial court denied both
motions. Appellant proceeded to trial, where he was convicted and sentenced by a jury. On
appeal, appellant reiterates his complaints concerning the admissibility of the evidence obtained
from his truck and person and the identifications by witnesses. He also raises a point of error
concerning ineffective assistance of counsel.



DISCUSSION



A.  Evidence Obtained from the Consent Searches

 Appellant's first point of error challenges the trial court's denial of his pretrial
motion to suppress the evidence found during the two consent searches. Appellant argues that this
evidence was inadmissible because his initial detention was an illegal warrantless arrest tainting
the consent and subsequently discovered evidence. Consequently, the threshold question is
whether appellant was indeed "arrested" before giving his voluntary consent to the searches.

 Under the Texas Code of Criminal Procedure, a person is arrested when "he has
been actually placed under restraint or taken into custody by an officer." Tex. Code Crim. Proc.
Ann. art. 15.22 (West 1977). An arrest is complete when a person's liberty of movement is
restricted or restrained. Chambers v. State, 866 S.W.2d 9, 19 (Tex. Crim. App. 1993), cert.
denied, 114 S. Ct. 1871 (1994). For Fourth Amendment purposes, a person is "seized" only if,
in view of all the circumstances, a reasonable person would have believed he was not free to
leave. Id. The determination of when a suspect is under arrest is based upon the totality of the
circumstances. Dancy v. State, 728 S.W.2d 772, 777 (Tex. Crim. App.), cert. denied, 484 U.S.
975 (1987). At a suppression hearing, the trial court is the sole and exclusive trier of fact and
judge of the credibility of the witnesses and the weight to be given their testimony. Romero v.
State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Meek v. State, 790 S.W.2d 618, 620 (Tex.
Crim. App. 1990). The findings of the trial court will not be disturbed absent a clear abuse of
discretion. Romero, 800 S.W.2d at 543; Dancy, 728 S.W.2d at 777. 

 Appellant first contends that he was "arrested" when he arrived at his place of
work, because a reasonable person would not feel free to leave when confronted by five police
officers. However, testimony at the suppression hearing disclosed that while five officers in street
clothes were present, only Cutler talked with appellant. Furthermore, there was testimony that
it was necessary to have several officers present because of the nature of the parking lot and the
need to talk to appellant before he entered the workplace. Cutler testified that he told appellant
he was conducting an investigation and needed to interview him. Cutler offered appellant a ride,
and appellant voluntarily agreed to go to the sheriff's office for the interview. One of the officers
notified appellant's supervisor that he was going for an interview. Appellant was not handcuffed
and rode in the front seat of Cutler's car. While en route they discussed football.

 When appellant was asked to go to the sheriff's office for an interview, detectives
were investigating an unsolved murder. Law enforcement officers are not precluded from asking
a person to voluntarily accompany them or providing transportation to the police station to further
the investigation of a crime. Shiflet v. State, 732 S.W.2d 622, 628 (Tex. Crim. App. 1985);
Callaway v. State, 818 S.W.2d 816, 836 (Tex. App.Amarillo 1991, pet. ref'd). If the
transportee is acting upon the invitation, request, or even urging of the police, and there are no
threats, express or implied, the accompaniment is voluntary and such a person is not in custody. 
Chambers, 866 S.W.2d at 19; Shiflet, 732 S.W.2d at 628; Dancy, 728 S.W.2d at 778-79.
Considering the totality of the circumstances of the initial encounter, the trial court's implied
finding that appellant was not under arrest at that time was not an abuse of discretion.

 Alternatively, appellant argues that if he was not under arrest at his workplace, the
voluntary encounter became a custodial arrest at the sheriff's office. When appellant arrived at
the sheriff's office, he was informed of his Miranda rights and indicated he understood those
rights. Cutler and Stewart interviewed him about Wagner's murder for three and one-half hours. 
During this time, appellant was cooperative. He was not restrained and never requested to leave. 
Investigators indulged every request appellant made. He was allowed to smoke despite
department policy prohibiting it. He used the restroom three or four times. During one of his
trips to the restroom, an investigator checked on him because he appeared nervous. When
appellant asked to talk to his fiancée, officers brought her to the sheriff's office where they talked
privately. Appellant made no response to his fiancée's statement to Cutler that she thought
appellant needed a lawyer. Instead, appellant continued the interview, ultimately signing the
consent forms. Before appellant gave his consent, Cutler learned of appellant's indictment. 
Cutler testified that he would not have released appellant after learning of the indictment.

 None of these circumstances transformed the voluntary interview into custodial
interrogation. Recitation of Miranda rights is more indicative of proper police cautiousness than
arrest. Dancy, 728 S.W.2d at 777. Nor is the length of the interview determinative. See
Callaway, 818 S.W.2d at 834-35, 837 (holding the trial court did not abuse its discretion in
finding that voluntary four-hour interview at police station was not custodial interrogation). 
Likewise, an officer's subjective impression of whether a suspect is free to leave is not
controlling. Amores v. State, 816 S.W.2d 407, 412 (Tex. Crim. App. 1991); Dancy, 728 S.W.2d
at 778. The sole question is whether, considering all the circumstances, a reasonable person
would have believed he was not free to leave. Here, appellant voluntarily accompanied the
investigators to the sheriff's office. After arrival, he was not searched, fingerprinted, handcuffed,
photographed, or told he was under arrest--the customary indicia of arrest. See Dancy, 728
S.W.2d at 777. Appellant was fully cooperative through the entire interview. He never requested
to leave and was never told he could not leave. Rather, every request appellant made was
honored. From the totality of the circumstances, there was ample evidence to support a trial court
finding that appellant was not under arrest when he gave his consent to search his truck and
person. Point of error one is overruled.



B.  Witness Identifications

 In his second point of error, appellant contends that the trial court erred by
admitting the identifications by Candace Smith Leonard and James Mailloux, because they were
the result of impermissibly suggestive photo lineups. A two-step analysis is used to determine the
admissibility of identifications following such a challenge. First, the photographic display must
not be impermissibly suggestive. Delk v. State, 855 S.W.2d 700, 706 (Tex. Crim. App.), cert.
denied, 114 S. Ct. 481 (1993). If the display is determined to have been impermissibly
suggestive, then based upon the totality of the circumstances, the suggestive procedure must not
give rise to a substantial likelihood of irreparable misidentification. Id. Consequently, we begin
our analysis with the "suggestiveness" of the photo lineups. (1)

 Appellant's challenge to the suggestiveness of the photo lineups is two-fold. First,
he argues that the fourth lineup, the only one to include his photo, was improperly suggestive
because he was the only suspect with curly hair. (2) Examination of this lineup reveals five white
males of approximately the same age, similarly dressed, all wearing light-colored cowboy hats. 
Very little hair, curly or otherwise, is visible from underneath the hats. We conclude that nothing
in this lineup is suggestive. See Glover v. State, 787 S.W.2d 544, 546 (Tex. App.Dallas 1990)
(holding lineup was not suggestive where the suspect was the only person with significantly curly
hair), aff'd, 825 S.W.2d 127 (Tex. Crim. App. 1992).

 Appellant's second challenge to the lineups is oblique. Apparently, appellant
contends that because Leonard and Mailloux had made tentative identifications of other suspects
in the three previous photo lineups that did not include his picture, the detectives must have been
using inherently suggestive procedures. Appellant does not, however, direct the Court to what
these alleged procedures were. In contrast, the testimony at the pretrial hearing reflects that
appropriate procedures were used. Witnesses were contacted at their places of employment to
view the lineups. No one was present except the witness, Cutler, and a victim-witness
coordinator. The witnesses testified that Cutler did not suggest to them that a suspect was in the
lineup or which suspect to select. While the witnesses made tentative identifications of suspects
other than appellant in the earlier photo lineups, it is undisputed that they made only one positive
identification--that of appellant in the fourth lineup. Under these circumstances, we cannot
conclude that police used suggestive lineup procedures tainting the identification testimony of the
witnesses. Point of error two is overruled.



C.  Ineffective Assistance of Counsel

 Appellant's final point of error alleges ineffective assistance of counsel. To
establish this claim, appellant must show: (1) that counsel's representation was deficient, and (2)
that but for counsel's deficient performance the result of the proceeding would have been
different. Strickland v. Washington, 466 U.S. 668, 693 (1984); Hathorn v. State, 848 S.W.2d
101, 118 (Tex. Crim. App. 1992), cert. denied, 113 S. Ct. 3062 (1993); Miniel v. State, 831
S.W.2d 310, 323 (Tex. Crim. App. 1992). Whether counsel provided reasonably effective
representation is judged by the totality of the representation and not by isolated acts and omissions
of trial counsel. Solis v. State, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990). Counsel's
competence is presumed, and a defendant must rebut this presumption with proof that his
representation was unreasonable under prevailing professional norms and that the challenged
action was not sound trial strategy. Miniel, 831 S.W.2d at 323. Appellant attempts to discharge
this heavy burden by directing this Court to eight isolated examples of alleged deficient
performance. We briefly address these examples to show that they fail to meet the rigid
Strickland standard.

 Initially, appellant identifies trial counsel's failure to object to Cutler's testimony
that there were many suspects prior to appellant who were eliminated through the investigation. 
However, it was counsel's trial strategy in this circumstantial evidence case to show that there
were many other suspects and what the police did and did not do to eliminate them. Counsel
described in argument that the State's entire case was "it could be" appellant. It is consistent with
this strategy to want testimony concerning these other suspects and the extent of investigation into
them. We cannot say that counsel's failure to object to Cutler's testimony concerning the
investigation of other suspects was unreasonable.

 Next, appellant contests the failure of counsel to object to testimony by Ranger
Stewart that he told appellant's fiancée "we have the right man." Appellant characterizes this as
an impermissible expression of the officer's opinion of appellant's guilt. However, Stewart did
not testify in response to a direct question that he believed appellant was guilty. Rather, his
testimony was in the context of discussing his attempt to convince West to persuade appellant to
confess. This is distinguishable from impermissible direct comments on a defendant's guilt. See
Boyde v. State, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974). Even if this comment were
deemed impermissible, counsel's failure to object is also consistent with his trial strategy. 
Counsel's cross-examination of the detectives had revealed that, twice before, they had used a
similar technique of telling a girlfriend or spouse that the suspect was guilty and needed to
confess. This is consistent with counsel's strategy that "it could be" anyone who committed the
murder.

 Appellant next challenges counsel's failure to object to Cutler's testimony that
appellant seemed "suspicious," "really nervous," "teary-eyed," and "fixing to make a statement." 
Counsel's failure to object was not unreasonable, because this testimony was admissible. See
Jackson v. State, 822 S.W.2d 18, 30 (Tex. Crim. App. 1990) (officer's opinion testimony as to
mental attitude or emotional state admissible if a mere shorthand rendition of the facts); Reece v.
State, 878 S.W.2d 320, 325 (Tex. App.Houston [1st Dist.] 1994, no pet.) (opinion testimony
based on training and experience admissible); see also Tex. R. Crim. Evid. 701.

 Similarly, appellant's fifth complaint involves lack of objection to testimony
concerning the victim's sexual likes and dislikes and that she was a "fighter." Again, this
evidence was admissible. "In all prosecutions for murder, the state . . . shall be permitted to offer
testimony as to all relevant facts and circumstances surrounding the killing . . . ." Tex. Code
Crim. Proc. Ann. art. 38.36(a) (West Supp. 1995). The theory of the prosecution and the
defensive theories determine the material issues in a murder case. Fielder v. State, 756 S.W.2d
309, 318 (Tex. Crim. App. 1988). One theory of motive offered by the State was that what began
as a consensual sexual encounter escalated into sodomy and murder. Evidence of the victim's
dislike of anal intercourse and propensity as a fighter is relevant to this theory.

 The sixth example of alleged ineffective counsel involves the failure to object to
testimony elicited by the State about appellant's temper. Rule 404 of the Texas Rules of Criminal
Evidence prohibits evidence of an accused's character traits to prove conformity therewith unless
offered by the accused. Tex. R. Crim. Evid. 404(a)(1). Even though counsel did not object to
this testimony on Rule 404 grounds, the record reflects that defense counsel did challenge in
cross-examination the credibility and motives of the witnesses who offered this testimony. It is
possible that trial counsel decided not to object to the direct testimony to avoid drawing attention
to it. Even if this was not counsel's strategy, a defendant is not entitled to error-free
representation. Miniel, 831 S.W.2d at 323; Davis v. State, 830 S.W.2d 762, 765 (Tex.
App.Houston [1st Dist.] 1992, pet. ref'd). This instance, even if it constituted an error by
counsel, would not meet the Strickland burden.

 Appellant's final examples concern counsel's failure to object to testimony by
appellant's former employers that he was terminated following arrest and that his work was
substandard. Appellant is unable to identify how exclusion of this evidence, whether relevant or
not, would have produced a different outcome. Again, the Strickland test is not met.

 In sum, none of the examples cited by appellant, individually or cumulatively,
establish ineffective assistance of counsel. Rather, the record reflects that trial counsel provided
an effective defense for appellant. Counsel contested the most incriminating evidence through
pretrial motions to suppress. Counsel actively participated in a day-long voir dire of potential
jurors. Defense counsel cross-examined thirty-four of thirty-six State witnesses at trial. Counsel
presented seven defense witnesses. Throughout the trial, counsel made objections, many of which
were sustained. Viewing the totality of the representation, appellant was not denied effective
assistance of counsel. Point of error three is overruled.



CONCLUSION


 Having overruled all of appellant's points of error, we affirm the conviction.



 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Jones and Kidd

Affirmed

Filed: June 21, 1995

Do Not Publish

1.   The State maintains that appellant waived any complaint concerning the
suggestiveness of the photo lineups because he affirmatively had "no objection" when the
lineups were offered in evidence. See Dean v. State, 749 S.W.2d 80, 83 (Tex. Crim. App.
1988) ("When an accused affirmatively asserts during trial that he has `no objection' to the
admission of the complained of evidence, he waives any error in the admission of the evidence
despite the pretrial ruling."). Appellant counters that his complaint is not with admission of
the lineups, but rather with admission of the identification testimony that was tainted by the
allegedly suggestive lineups. We assume without deciding that appellant has preserved his
point of error and address the merits of his complaint.
2.   Witness Candace Leonard had previously described the suspect as having curly
hair.